# Dillon *v.* Myers et al., School Directors.

## [MAY 29, 1844.]

Where an officer claims rights by virtue of his office, he must show that he is legally qualified to act; that he is the officer *de jure* as well as *de facto*.

A person who has not received a certificate as required by the act of April 1st, 1834, has no claim to compensation for his services as teacher, although appointed teacher by a school committee of a sub-district.

It is the imperative duty of school directors to examine every applicant wishing to be employed as a teacher, and their inquiries are to be confined to the "moral character" and "learning and ability" of the applicant.

Under the provisions of the acts relating to schools, the school directors are the legal visitors, and, under the powers conferred upon them, may suspend or dismiss a teacher, or correct any abuses in the school; in case of a sub-district, they should notify the committee of such sub-district of the suspension or dismissal of a teacher.

Where a teacher who was appointed by a school committee of a sub-district, had not received the requisite certificate, and who, upon application to the directors, they refused to examine, proceeded to occupy the school-house and teach the scholars, against the will of the "directors;" on a mandamus to the school directors to pay his salary: *held,* that he could not be employed or receive compensation, and that the school directors upon a visit for the purpose, had authority to terminate his powers.

ERROR to the Common Pleas of Lancaster.

The facts of this case sufficiently appear in the opinion of the court below, which was delivered by

LEWIS, President.—This is an application by George D. Dillon for a mandamus. On the 23d June, 1843, he presented his petition to this court, setting forth, among other matters, that before the 9th July, 1842, the township of Conestoga was duly divided into sub-districts under the common school law; that on the said 9th July, 1842, after due notice, Samuel Harmon and others (named in the petition) were duly elected a school committee for one of the said sub-districts, for the term of one year, according to the provisions of the 8th section of the act of 13th June,

[Dillon *v.* Myers.]

1836; that the said committee appointed the petitioner a teacher for said district for the term of five months from the 25th of September, 1842, at twenty dollars per month; that the said petitioner presented himself to the respondents, school directors of said township, for examination, but they declined to enter upon the examination desired; that the petitioner then entered upon the discharge of his duties as teacher in the public school-house of the district, taught the scholars of the district for the term agreed upon, and demanded payment from the school directors, which they refused. The petition concludes with a prayer for a mandamus commanding the school directors to draw an order on the treasurer of said district for the sum of $100, compensation for his services thus rendered. An alternative mandamus was accordingly awarded, commanding the respondents to draw the order, or signify cause to the contrary. On the 21st August, 1843, the respondents made return, as the cause of their refusal (among other matters) that in March, 1842, about three months previous to the time when the said Samuel Harmon *et al.* were elected a school committee, as alleged in the petition, a different committee was elected in pursuance of notice given by the president of the board of school directors and by order of the board; that at the time the board of school directors met in said year to examine persons "as to the propriety of their being employed as teachers in their districts," there were reasons produced before the said board, which the directors deemed sufficient to induce them not to issue their certificate to said Dillon, that he was qualified and of good moral character, one of which reasons "deemed amply sufficient by the said directors," is stated in the return to be a "personal animosity towards three or four families that were to send their children to the school of said sub-district." It is further stated, in the return, that the directors "did not employ said Dillon as teacher" or "sanction his employment in any way;" but, on the contrary, that the said Dillon took possession

[Dillon *v*. Myers.]

·of the public school-house, without authority, and refused to give up possession to the said directors, who demanded possession, and informed him that his proceedings were unauthorized and at his peril, and that they would not pay him or authorize his being paid as a teacher. It is further stated, in the return, that the said directors established a common school in said sub-district, in the place of the one they had been thus deprived of, in which the teacher chosen by the committee first elected taught the school; &c.

To this return there was a demurrer and joinder in demurrer, and the case comes before the court for judgment on the record.

In the course of the argument, the opinion of the Hon. Charles M'Clure, secretary of state and superintendent of common schools, was read to the court. That officer is authorized by act of assembly, "to settle and adjust, without cost to the parties, all controversies arising among the directors of any district or adjoining districts, concerning the duties of their office, the distribution of the state appropriation, or the levying and collection of taxes." This is not a controversy "among the school directors." They appear to have no controversy among themselves. But the controversy is between the school directors on the one side, and a person claiming compensation as teacher on the other. It follows that the opinion of the superintendent is not conclusive upon the questions in dispute. It is nevertheless entitled to the most respectful consideration, as disclosing the views of a high and intelligent public officer, whose official duties have necessarily made him familiar with the school system under his charge. It is his opinion that the election of the committee first chosen, to wit: on the 24th March, 1842, was illegal, because notice for the election was given by the president of the board of school directors. The law requires the notice to be given by "not less than four voters of the district." It is also his opinion that the teacher appointed by the committee after-

[ Dillon *v.* Myers. ]

wards elected, cannot enforce payment of his salary because he has not obtained from the school directors the certificate of qualifications and character, required by law previous to his being employed as a teacher. It is believed, on careful consideration, that the opinion of the superintendent, on both the points stated, is sound, and fully sustained by a fair construction of the acts of assembly.

By the act of 13th June, 1836, section 9, it is declared that when a district shall be divided, "the committee of each sub-district shall have the appointment of the teachers of such sub-districts respectively." But the appointing power, thus conferred upon the committee, must be exercised in subordination to such regulations as have been prescribed by law, and none but persons eligible by law can be appointed. By the act of 1st April, 1834, it was provided that the school inspectors should "examine every person wishing to be employed as a teacher; and, if found qualified, and of good moral character," they were required "to give a certificate to that effect, naming therein the branches which he or she was found qualified to teach;" and it was expressly declared in the same act, that "no person who shall not have obtained such certificate, shall receive any compensation for his services." By the act of 15th of April, 1835, school inspectors were dispensed with, and all the duties of the inspectors were required to be performed by the directors of the several districts. By the act of 21st April, 1840, it was again provided, that "persons wishing to be employed as teachers, should be examined by the school directors, in conjunction with such persons as they may associate with themselves for the purpose, and if found qualified, and of good moral character," a certificate was directed to be issued as previously required by the act of 1st April, 1834; and it was further provided, by the act of 1840, that "no person shall be employed as a teacher unless he shall have procured such certificate."

It is apparent, from these enactments, that the appointing

power, conferred upon committees of sub-districts, was under legislative restriction; and that they were necessarily confined, in their selection, to those who had received from the school directors the proper certificate of character and qualifications. None others were eligible. If they ventured to appoint a person destitute of this certificate, such act could only be regarded, at the most, as a contingent selection, depending for its validity upon the subsequent grant of a certificate by the directors. Without such certificate, he could not legally enter upon the duties of the appointment. By one act of assembly, it was declared that he should not be "employed," and by another it was provided that he should not "receive any compensation for his services." The acts, being in *pari materia*, and not being inconsistent with each other, in regard to the consequences of appointing a teacher destitute of the requisite evidence of character and qualifications, both provisions, on that subject, may be taken to be in force; so that a teacher appointed by a school committee, if destitute of the required certificate, can neither be "employed" in that capacity nor "receive any compensation for his services." His right to occupy the public school-house and his claim to compensation, are both denied. The circumstance of his having acted as the teacher, under an illegal employment, does not therefore entitle him to compensation under the acts of assembly, which are expressly against the claim. The principles of the common law are equally against it. It is true that where strangers are concerned, it is sufficient, for rights depending upon official acts, to show that the acts were performed by the officer *de facto*. But where the officer himself is claiming rights by virtue of his office, he must show that he was legally qualified to act—that he was the officer *de jure* as well as *de facto*. This is clearly the rule where the claim is for compensation for services rendered in such capacity. In *Riddle* v. *Bedford County*, 7 S. & R. 389, it was held that one who had purchased

[Dillon *v.* Myers.]

unseated lands at the treasurer's sales for non-payment of taxes, was not bound to pay the treasurer his fees for his services in advertising, selling and making conveyances of the land, because the treasurer who had rendered the services had not taken the oath required by the constitution to be taken by all officers. The titles conveyed were clearly good, and the acts of the officer unquestionably valid as respects others. But the officer himself could claim no benefit derived from an office in which he had not been duly qualified to act.

But it is alleged that the petitioner presented himself for examination, and the directors refused to discharge their duty in that respect. It would seem from the return, that "the directors met for the purpose of examining persons, as to the propriety of their being employed in their districts." In this step the directors committed an error. It was not for them to inquire, in the first instance, as to the propriety of employing particular teachers, where the district had been divided into sub-districts. The power of appointing teachers belonged to the committee of the sub-district, and that committee was the proper authority to determine upon the propriety of employing particular persons within the sub-district. The meeting of the directors should have been for the purpose of examination touching the qualifications and moral character of persons wishing to be employed as teachers. Granting that the "personal animosity" of the proposed teacher towards "three or four families" of the sub-district, furnished an objection to his being employed in that particular sub-district, it was clearly no objection to his employment elsewhere, and was therefore no reason for withholding a certificate of general character and qualifications, the possession of which was necessary in order that the applicant might seek employment in quarters where no such objection existed. This objection might have been considered by the board of directors, if they found any evil results from it, when acting in their superintending

capacity as visitors. But when acting as examiners, they had nothing to do with the question, and the existence of the reason alleged forms no justification to the directors in neglecting a duty positively enjoined on them by law.

The directors state also in their return, that they refused the certificate "for causes which they deemed sufficient." The "causes" are not stated. The directors are required by law to examine "every person wishing to be employed as a teacher." It appears upon the record that they have refused to perform this duty, notwithstanding that the petitioner "presented himself for examination." Those who accept public employments are bound to discharge the duties required of them by law, or assign such reasons for the refusal as shall be deemed sufficient by the tribunals appointed to decide. It is only where a discretionary power is given to do or omit any particular act, that the omission can be justified by a general averment of causes not specified, but which were deemed sufficient by the party refusing to act. In respect to the duty of examining the applicants, there was no discretion reposed in the directors. The law is imperative, and nothing can justify a refusal to perform it, except a defect in the moral character of the applicant, which would, of course, render unnecessary an examination touching his literary qualifications. When the examination takes place, it must of course be confined to "moral character" and "qualifications." The "qualifications" intended, are "learning and ability" to teach. The legislative enactments, in restraining the inquiries to the "moral character" and "learning and ability" of the candidate, contain an affirmative pregnant with a negative upon all inquiries touching other matters. If the examiners should be permitted to take one step beyond the boundaries assigned by law, it is impossible to tell where ignorance, passion, or prejudice might lead them. Intolerant members of different religious denominations, harmonizing in some particular views, might feel it to be their duty to exclude

[Dillon *v.* Myers.]

others of less numerical strength, from all participation in a system supported by the common means, designed for the common benefit, and emphatically designated in the law as the common school. In a *quare impedit*, the bishop of Exeter returned, as a reason for refusing to admit the patron's clerk, that he was "insufficient in learning," and the return was held to be good. 4 Mod. 140. It does not seem to be necessary to specify in what points the applicant is deficient; a general allegation that he is "deficient in learning" is good. 1 Bl. Com. 390. But where the office is one which requires an adherence to the established church, as a qualification, a return of "*schismaticus invete-ratus*," is insufficient. The particular schism must be set out. *Specott's Case*, 5 Coke, 57.

The school directors have not shown in their return that the petitioner was deficient either in "moral character," or in "learning and abilities to teach," and therefore their refusal to grant the certificate, stands upon the record without any justification or excuse. It does not follow, however, that the proper remedy for this injury was a resort to the measures which were adopted by the teacher, under the direction of the sub-committee. In this, as in many other cases, there are faults on both sides. While the directors, without any sufficient cause, were refusing to discharge a duty enjoined upon them, the teacher, equally under a mistake of his rights, established himself in the public school-house without the legal evidence of qualification—refusing to deliver up possession on the demand of the school directors, although notified by them that his proceedings were unauthorized, and that they would not pay him for his services. Although this intrusion into the public rights is not to be justified, it is easy to perceive that it was occasioned by a desire to redress a wrong previously committed by the school directors. Resistance by a subordinate is, however, neither a safe nor a legal remedy for a mistaken exercise of existing authority. The injury

should have been redressed, if at all, by a resort to the laws to compel the directors to make the examination, or to pay damages for the refusal.

It must be remembered that by the act of 13th June, 1836, the school directors are authorized to "establish a sufficient number of schools—to cause suitable buildings to be erected, rented or hired—supply the schools with fuel—fix the compensation of the teachers—direct in which schools persons admitted shall be instructed—pay all necessary expenses, and to exercise a general supervision over the schools in their respective districts." And each "board of directors, by one or more of their number, shall visit every school in the district, at least once in every month, and shall cause the result of said visit to be entered on the minutes of the board." Under the act of 15th April, 1835, transferring the powers of the inspectors to the directors, the latter were required to " visit the schools at least once in every three months, and authorized to visit them as much oftener as they think proper," to inquire into the moral character, learning and ability of the several teachers employed therein. If the directors deem it expedient to divide a district into sub-districts, the committees of the sub-districts " shall have the appointment of the teachers " therein respectively. But all other powers of the committee are to be exercised only upon " the direction of the school directors," under the 14th section of the act of 12th April, 1838. If " directed by the board," they may " attend to all the local concerns, such as visiting the schools, preparing fuel, repairing school-houses." The schools are so dependent upon the arrangements of the school directors, financial as well as otherwise, that the law has wisely given them power to " exercise a general supervision," and has constituted them visitors, making monthly and quarterly visits imperative, and authorizing them to " visit as much oftener as they think proper." And, for the purpose of guarding against conflicting regulations, and securing harmony and

subordination, the existence of sub-districts is made dependent upon their discretion, and all authority within the same, except that of appointing the teachers, is to emanate from them, and to be exercised upon their direction, and not otherwise. The school directors are made the legal visitors of the schools, and they are required to visit periodically. Whether they perform this duty by one or more of their number, or by the sub-committee under their direction, it is still, in intendment of law, the act of the board, and the "result" is required to be recorded on their minutes. It will scarcely be pretended by any one that the "visits" which are enjoined with so much solemnity by the legislature, were intended as mere acts of formal courtesy to the teachers and scholars, or that the "results" which are deemed of sufficient public interest to be recorded upon the minutes, were expected to be of no greater importance than those of a morning or evening call in the social intercourse of society. When the law makers adopt a term of known legal signification, they are presumed to know its meaning, and to use it in the sense in which it is understood by the law. By the common law, the founder of an hospital, college, school, &c., is, of common right, the legal visitor, to see that the property is rightly employed. Where no revenues are given, the sovereign authority giving the corporate or legal existence, has the right to visit as *fundator incipiens.* Where revenues are given, he who makes the donation has the right to visit as *fundator perficiens;* the right descends to his heirs—may be assigned to others—or performed in person. Where the commonwealth is at once the incipient and perficient founder, conferring both the legal existence and the revenues, the right of visitation by such agents as she chooses to employ, cannot be questioned. The common law powers of a visitor are not to be restrained except by negative words. A direction, in a statute, to visit for particular purposes, and at particular times, is no restraint

[Dillon v. Myers.]

upon the general authority to visit at other times, and for other legitimate purposes. 4 Mod. 109; 4 M. & S. 415. The visitor is to judge according to the statutes of the college, and to expel or deprive upon just occasions—to hear all appeals of course—from him and him only, the party aggrieved ought to have redress—his determinations are final, and examinable in no other court whatever. He may suspend or deprive for contumacy, for it is requisite to the exercise of his office. His jurisdiction need not be exercised by common law rules. In pleading a sentence or deprivation by a visitor, he need not, in the case of a private founder, show the cause, for that is not traversable. The visitorial power is consequent upon the patronage, by the common law, and is not introduced by any canon or ecclesiastical constitution, and it extends to hospitals, colleges, free schools, &c., not spiritual. If his jurisdiction is limited by rules and statutes, and in his sentence he exceed those rules, an action lies against him; but it is otherwise where he only mistakes in a matter within his jurisdiction. He has no authority to determine matters against the statutes of the realm, for he is a private judge who is to determine only offences against the statute of the college or school where he is visitor, and if he intermeddle in a matter out of his jurisdiction a prohibition lies. These principles respecting the powers of visitors were, in the main, held to be law by Chief Justice Holt, in the case of *Phillips* v. *Bury*, in which he was fully sustained by the parliament upon a writ of error; "and to that leading case," says Sir William Blackstone, " all subsequent determinations have been conformable." 1 Bl. 483; 4 Mod. 106, 123; 13 Ass. pl. 29; Rast. Ent. 1, 2; 7 E. 354; 4 Mod. 110; Cas. Parl. 43; 7 Com. Dig. 568; 2 T. R. 290; 4 Mod. 238, 241, 369; Noy, 91; Carth. 93; 4 Wheat. 518; 2 Kent, 302-3-4. The president of Magdalen college was deprived by the bishop of Winton, who was the legal visitor, and no appeal was allowed. Dr. Bury, the rector

[ Dillon *v.* Myers.]

of Exeter college, was deprived by the bishop of Exeter, who was visitor, and the sentence was held to be conclusive. The warden of a lay hospital was deprived by the visitor, and it was held by Herle, chief justice of the common pleas, that whether the sentence of deprivation were right or wrong, was not examinable in that court.

It is not necessary, in this case, to determine how far the acts of a board of school directors in their supervisory and visitorial capacity, are examinable in the courts of justice. In cases where the revenues are provided by the public, and the rights of the whole community involved, these agents of the commonwealth are doubtless amenable to the proper tribunals, when they transcend their authority or violate the laws of the land. 2 Kent, 303–4. But under the power which has been conferred upon the school directors to supervise and to visit, there is no doubt that upon a visit for the purpose, they may correct all abuses in the school, and may suspend or deprive a teacher, whenever, in their judgment, the interests of the system require such a measure. Upon suspending or dismissing a teacher for just cause, it is their duty, in the case of a sub-district, to give notice to the committee of the sub-district, in order that the latter may appoint another; and only on their failure to do so, could the power of appointing a teacher be exercised by the directors, as in the case of a lapse, by virtue of their general authority.

The office of visitor is one of great responsibility, with jurisdiction and powers recognised by the common law, and, by the acts of assembly, conferred upon the directors. These remarks, in regard to the duties of that office, and the powers of the school directors, have been made because the subject is one of much general concern—because the duties of the office do not appear to have been properly performed on the one side, or its authority sufficiently respected on the other; and because an impartial discharge

[ Dillon *v.* Myers. ]

of its duties and a just respect for its authority, is absolutely necessary for the well ordering of the general system of education established by law.

It must be remembered, however, that the present is not an application by the teacher to compel the directors to examine him and grant a certificate of character and qualifications. Nor is it an action against them to recover damages for their refusal to do so. The application before us, is to compel them to draw their warrant in his favour for compensation as teacher; and the objections to it are twofold. In the first place, the acts of assembly are express, that the applicant destitute of a certificate is neither entitled to be " employed," nor to " receive compensation." In the second place, he could not legally hold the office of teacher, and the possession of the public school-house, after his powers had been suspended or terminated by the decision of the school directors, upon a visit for the purpose. Although the proceedings of the directors, upon coming to the school-house, in demanding possession, and in giving notice that the acts of the teacher were unauthorized and at his peril, may have been informal, it is but fair to consider them a substantial exercise of their legitimate powers of supervision as visitors. As such, their determination ought to have been submitted to, until redressed, if illegal, by due course of law. It is much better that even an unjust sentence be submitted to, until legally reversed, than that a subordinate agent should be permitted to take the law into his own hands—be the judge in his own cause—take possession of the public property—and resist the decision of those whom the law had clothed with superior authority.

It is the opinion of the court, upon this demurrer, that judgment be entered for the respondents with costs.

*Stevens*, for plaintiff.
*Parke*, for defendants.

[Dillon *v.* Myers.]

The plaintiff sued out a writ of error upon this judgment; and on the 29th of May, 1844, after argument, the supreme court affirmed the judgment of the court below.

Judgment affirmed.